No. 24-740 – *In re K.S.*

**FILED**

**May 15, 2026**

released at 3:00 p.m.
C. CASEY FORBES, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

EWING, Justice, concurring:

I write separately to emphasize that "reasonable efforts/no reasonable efforts findings are the most powerful tools . . . judges have at their disposal" in abuse and neglect proceedings, Leonard Edwards, *Reasonable Efforts: A Judicial Perspective* 12 (1st ed. 2014) (hereinafter, "*Reasonable Efforts*"),[1] not simply buzz words to be rotely quoted in court orders. Often, it appears that courts include a "reasonable efforts" finding in abuse and neglect orders without regard to the import of those findings or the actual circumstances in the case. *See id.* (observing that "attorneys rarely refer to reasonable efforts in court, and most judges approve of what the agency has done with little or no thought about it."). However, federal and state law impose an affirmative, ongoing duty upon the judiciary to independently evaluate whether the DHS has made genuine, meaningful efforts—"reasonable efforts"—to prevent removal, foster reunification, and achieve permanency. As such, rubber-stamping the DHS's actions, or lack thereof, as "reasonable" undermines due process, contravenes statutory mandates, and risks

---

[1] Judge Edward's book is publicly available in its entirety on Judge Leonard Edward's website at http://www.judgeleonardedwards.com/docs/reasonableefforts.pdf (last visited May 8, 2026). A second edition of the book, "Reasonable Efforts: A Judicial Perspective 2nd Edition," was released by Judge Edwards and the National Council of Juvenile and Family Court Judges ("NCFCJ") in 2022 and is available for purchase on the NCFCJ website. He recently provided an adapted overview of the concepts addressed in the book in a 2025 article. *See* Leonard Edwards, *Reasonable Efforts: A Judicial Perspective*, Juv. Just. Update (Nat'l Conf. of State Legis.), Summer 2025, at 3, https://judgeleonardedwards.com/docs/JJU-3102-03-Edwards-Reasonable-Pt%20I.pdf.

1

converting temporary state intervention into a self-fulfilling pathway to permanent termination of parental rights.

To better understand why courts should consider "reasonable efforts/no reasonable efforts" findings as "powerful tools," it is important to identify the genesis of "reasonable efforts" under federal law. Title IV-E of the Social Security Act, 42 U.S.C. §§ 670–679c, as amended by the Adoption and Safe Families Act of 1997 (Pub. L. 105-89) ("ASFA"), conditions receipt of federal funding for children in foster care on state social service agencies, such as the DHS, complying with certain requirements including the provision of "reasonable efforts . . . to preserve and reunify families." 42 U.S.C. § 671 (a)(15)(B). Federal regulations state that:

> The title IV–E agency [such as the DHS] must make reasonable efforts to maintain the family unit and prevent the unnecessary removal of a child from his/her home, as long as the child's safety is assured; to effect the safe reunification of the child and family (if temporary out-of-home placement is necessary to ensure the immediate safety of the child); and to make and finalize alternate permanency plans in a timely manner when reunification is not appropriate or possible. . . . In determining reasonable efforts to be made with respect to a child and in making such reasonable efforts, the child's health and safety must be the paramount concern.

45 C.F.R. § 1356.21(b) (2023). Under federal law, state courts with juvenile jurisdiction are tasked with holding the state agency accountable by determining if the agency made

2

"reasonable efforts." *Id.; see also* 42 U.S.C. § 671(a)(15).[2] The judicial determination of "reasonable efforts" must be "explicitly documented and must be made on a case-by-case basis and so stated in the court order." 45 C.F.R. § 1356.21(d). Federal law requires judicial—not administrative—verification of "reasonable efforts."

West Virginia law codifies and reinforces this mandate. To ensure compliance with Title IV-E—and so that West Virginia is eligible to receive federal reimbursements for West Virginia children in foster care—the West Virginia Child Welfare Act, West Virginia Code §§ 49-1-101 through 49-12-5, incorporates the federal guidelines and requires that circuit courts determine whether the DHS has made "reasonable efforts" throughout child abuse and neglect proceedings. *See* W. Va. Code § 49-4-602(a)(4)(B), § 49-4-604.

Under both federal and state law, courts must make "reasonable efforts" findings in three different contexts of an abuse and neglect case: when a child is removed from the home, in relation to efforts to reunify the family after removal, and in finalizing permanency for the child.

---

[2] The ASFA amendments to Title IV-E of the Social Security Act identified circumstances that relieve the state agency of its obligation to make "reasonable efforts." 42 U.S.C. § 671(a)(15)(D); 45 C.F.R. § 1356.21(b)(3). These circumstances, referred to as "aggravating circumstances," have been incorporated into West Virginia's Child Welfare Act. *See* W. Va. Code § 49-4-602(d) (2015); W. Va. Code § 49-4-604(c)(7) (2020). As noted in the majority opinion, none of these circumstances are present here, so it is not necessary for this opinion to address the exceptions to the "reasonable efforts" requirement.

First, within sixty days from the date a child is removed from a home, there must be a judicial finding that "continuation in the home from which removed would be contrary to the welfare of the child" and that the DHS made "reasonable efforts" to preserve and reunify the family. 42 U.S.C. § 672(a)(2)(A)(ii); *see also* 45 C.F.R. § 1356.21(b)(1)(i). If a judicial determination concerning "reasonable efforts" to prevent removal is not made as required, the State will *never* receive federal funding for that child for the duration of that child's stay in foster care. 45 C.F.R. § 1356.21(b)(1)(ii) (emphasis added).[3] The corresponding West Virginia Code § 49-4-602(a)(4) requires that, upon removal of a child from the home, the circuit court's order must state "[t]hat continuation in the home is contrary to the best interests of the child and why" and "[w]hether or not the [DHS] made reasonable efforts to preserve the family and prevent the placement . . . ." *See also* W. Va. Code § 49-4-602(b) and (c). These findings are typically made at the preliminary hearing or in the initial order authorizing removal, but one commentator has observed that reasonable efforts to prevent removal are rarely litigated. *See* Leonard Edwards, *Ignoring Reasonable Efforts: How Courts Fail to Promote Prevention*, The Imprint (Dec. 5, 2018, at 07:00), https://imprintnews.org/opinion/ignoring-reasonable-efforts-why-court-system-fail-promote-prevention/32974 (noting that less than 1% of appellate case law deals with this issue).

---

[3] These findings cannot be made in a nunc pro tunc order after the 60-day period has expired. *See* Leonard Edwards, *Reasonable Efforts: A Judicial Perspective*, Juv. Just. Update (Nat'l Conf. of State Legis.), Summer 2025, at 7, https://judgeleonardedwards.com/docs/JJU-3102-03-Edwards-Reasonable-Pt%20I.pdf. .

Second, during an abuse and neglect proceeding, courts are required to examine and make findings related to the reasonableness of the DHS's efforts "to preserve and reunify families . . . [and] to make it possible for a child to safely return to the child's home." 42 U.S.C. § 671(a)(15)(B). Federal regulations provide that, to be eligible to receive federal funding, the state agency such as the DHS "must make reasonable efforts to maintain the family unit . . ., as long as the child's safety is assured; to effect the safe reunification of the child and family (if temporary out-of-home placement is necessary to ensure the immediate safety of the child)." 45 C.F.R. § 1356.21(b).

West Virginia law incorporates these requirements in the statutes governing improvement periods, disposition, and permanency. *See* W. Va. Code § 49-4-604; § 49-4-608(e) (2023); § 49-4-610(5) (2015). This Court has recently stated that West Virginia Code § 49-4-604 requires "the circuit court to consider whether the DHS made reasonable efforts to preserve and reunify the family *prior to* terminating a parent's parental rights." *In re H.B.*, 252 W. Va. 350, 922 S.E.2d 350, 360 (2025) (emphasis added). Importantly, not only must a court *consider* the DHS's efforts, but also the court must document its determination in a written court order. Specifically, when a court determines that the appropriate disposition in an abuse and neglect case is either legal guardianship or termination of parental rights, the court order must state "[w]hether or not the [DHS] has made reasonable efforts, with the child's health and safety being the paramount concern, to preserve the family, or some portion thereof," what efforts were made, or why efforts were unreasonable if services were not offered. W. Va. Code § 49-4-604(c)(5) and (6).

These same findings must also be included in the court's permanency order. W. Va. Code § 49-4-608(e)(1).

Finally, reasonable efforts must be made to timely finalize the permanent placement of the child. 42 U.S.C. § 671(a)(15)(C); 45 C.F.R. § 1356.21(b). Federal law requires that there be an "explicitly documented" judicial determination, "made on a case-by-case basis," 45 C.F.R. § 1356.21(d), that the state agency, such as the DHS, "has made reasonable efforts to finalize the permanency plan that is in effect." 45 C.F.R. § 1356.21(b)(2)(i). If a court fails to make the required findings or to include them in a court order, the DHS will not receive federal funding for the child in the month in which the judicial determination was required to have been made and until such a determination is made. 45 C.F.R. § 1356.21(b)(2)(ii). These requirements are integrated in West Virginia's abuse and neglect statutes with the requirement that a circuit court's permanency order must state "[w]hether or not the [DHS] made reasonable efforts to finalize the permanency plan." W. Va. Code § 49-4-608(e)(2).

In each of these contexts—removal, working toward reunification, and permanency—the DHS is statutorily obligated to make "reasonable efforts," but neither federal nor state law defines "reasonable efforts."[4] Additionally, West Virginia case law

---

[4] The *Child Welfare Policy Manual*, published by the Administration for Children & Families of the United States Department of Health & Human Services, explains that:

> We have not, nor do we intend to define "reasonable efforts." To do so would be a direct contradiction of the intent

discussing the meaning of "reasonable efforts" is limited.[5]  The "reasonable efforts"

concept, however, is easily understood in relation to the overarching purposes of abuse and

neglect proceedings:  to correct the conditions of abuse or neglect and to reunify the family,

---

of the law. The statute requires that reasonable efforts determinations be made on a case-by-case basis. We think any definition would either limit the courts' ability to make determinations on a case-by-case basis or be so broad as to be ineffective.

U.S. Dep't of Health & Hum. Servs., Admin. For Children & Families, *Child Welfare Policy Manual* § 8.3C.4, in part, https://cwpm.acf.gov (last visited May 8, 2026).

[5] When this Court has addressed the DHS's statutory obligation to make "reasonable efforts," the analysis is necessarily very case-specific.  For instance, this Court found the DHS failed to make reasonable efforts where the DHS refused to renew a special medical card that had expired, which was necessary for substance abuse treatment.  *See In re M.M.*, 244 W. Va. 316, 853 S.E.2d 556 (2020).  Other cases have found that "reasonable efforts" include the filing and implementation of a case plan.  *See, e.g.*, *In re Edward B.*, 210 W. Va. 621, 632, 558 S.E.2d 620, 631 (2001) (finding case plan deficient where strategies recommended in the plan were never employed or attempted); *In re Jonathan G.*, 198 W. Va. 716, 734, 482 S.E.2d 893, 911 (1996) ("Once the court made the determination that reunification was the goal, however, [DHS] should have worked diligently to accomplish that goal.").  "Availability for communication with parents is [also] an integral part of fulfilling" the statutory duty to make reasonable efforts to preserve the family.  *In re G.M.*, No. 19-0844, 2020 WL 3447536, at *4 n.6 (W. Va. June 24, 2020) (memorandum decision).

On the other hand, this Court frequently upholds circuit courts' reasonable efforts findings where the DHS has provided case-specific services aimed at remedying the conditions of abuse and neglect, but adult respondents failed to participate. *See, e.g.*, *In re H.B.*, 252 W. Va. 350, 922 S.E.2d 350, 361 (2025); *In re K.P.*, No. 25-234, 2026 WL 820824, at *2 (W. Va. Mar. 24, 2026) (memorandum decision); *In re R.W.*, No. 25-337, 2026 WL 688916, at *4 (W. Va. Mar. 3, 2026) (memorandum decision).  Similarly, reasonable efforts do not require that a parent be granted an improvement period.  *In re D.S.*, No. 21-0798, 2022 WL 710470, at *3 (W. Va. Mar. 9, 2022) (memorandum decision) (explaining that the parent bears the burden of proving entitlement to an improvement period and concluding that "there is no error in finding that reasonable efforts were made despite the fact that no improvement period was granted.").

if possible.[6]  The key to achieving these purposes is providing individualized, meaningful, and rehabilitative services intended to remedy the abuse or neglect that led to the child's removal.  The DHS bears the responsibility for making good-faith efforts to provide such services under federal and state law.  *See* 45 C.F.R. § 1357.15 (2016) (establishing guidelines for suggested services for children and families).

When the DHS fails to provide timely and meaningful services, whether by

---

[6] This Court has explained that,

> the ultimate goal in abuse and neglect proceedings is the repair of the conditions in the home that led to the petition's filing and the reunification of the child(ren) with his/her parent(s) when such reunification will serve the child(ren)'s best interests. *See, e.g.*, W. Va. Code § 49-1-105(b)(3) (2015) (identifying purpose of "[t]he child welfare . . . system" as including to "[p]reserve and strengthen the child family ties"); W. Va. Code § 49-4-604(a)(2) (requiring family case plan to "facilitate the return of the child to his or her own home").

*In re H.W.*, 247 W. Va. 109, 121, 875 S.E.2d 247, 259 (2022); *see also State ex rel. L.D. v. Cohee*, 247 W. Va. 695, 702, 885 S.E.2d 633, 640 (2022) ("[T]he [West Virginia] Legislature and this Court have made clear that abuse and neglect proceedings are, first and foremost, remedial in nature.  This is more than apparent from the consistent emphasis the Legislature places on 'reunification' throughout Chapter 49 of the West Virginia Code."); *State ex rel. C. H. v. Faircloth*, 240 W. Va. 729, 741, 815 S.E.2d 540, 552 (2018) ("Certainly the over-arching purpose of our abuse and neglect statutory construct continues to be the correction of conditions of abuse and neglect and the return, if reasonably possible, of the children to their homes").  Additionally, under ASFA, "the presumptive case plan goal is family reunification," except in cases of aggravated circumstances. Sophie I. Gatowski et al., *Enhanced Resource Guidelines: Improving Court Practice in Child Abuse and Neglect Cases*, Nat'l Council of Juv. and Fam. Ct. Judges 143 (2016), https://www.neyoungchildinstitute.com/sites/default/files/2024-06/ncjfcj-enhanced-resource-guidelines-05-2016.pdf (last visited May 8, 2026) (hereinafter "*Enhanced Guidelines*") (noting that aggravated circumstances as defined under federal law "relieve the agency of the responsibility to make reasonable efforts to work toward a plan of reunification.").

delaying referrals, failing to facilitate visitation and family time, neglecting transportation barriers, or otherwise undermining participation, it deprives the parent of the opportunity for reunification the law contemplates. In that situation, a finding that the parent failed to remedy conditions of abuse and neglect therefore does not reflect parental incapacity or unfitness, but rather a systemic failure. The DHS's inaction produces the very noncompliance it later relies upon as grounds for termination. Such a result is incompatible with the Child Welfare Act, which requires that termination be based on a demonstrated inability to improve despite reasonable efforts. *See* W. Va. Code § 49-4-604(d) ("'No reasonable likelihood that conditions of neglect or abuse can be substantially corrected' means that, based upon the evidence before the court, the abusing adult or adults have demonstrated an inadequate capacity to solve the problems of abuse or neglect on their own or with help."). In short, failure to provide necessary services becomes a self-fulfilling prophecy for termination, which is further exacerbated by the inertia to move the case to permanency when objections to "reasonable efforts" are not raised until disposition, especially when the child has been in placement for months or years by that time.

> A parent who raises a reasonable efforts issue at a termination hearing presents the judge with a difficult decision. . . . The case law indicates that given this situation, the pressure on the judge and the appellate courts is to affirm the termination of parental rights decision.

Leonard Edwards, *Reasonable Efforts: A Judicial Perspective*, Juv. Just. Update (Nat'l Conf. of State Legis.), Summer 2025, at 9, https://judgeleonardedwards.com/docs/JJU-3102-03-Edwards-Reasonable-Pt%20I.pdf.

Equipped with oversight authority and broad discretion under the reasonable efforts regime, circuit courts are the safeguard to ensure that the child welfare system does not default into automatic termination. Throughout abuse and neglect proceedings—from removal, while working toward reunification, and at permanency—circuit courts must seriously evaluate the DHS's efforts to determine whether or not they are "reasonable" and to ensure that the DHS "fulfills its legal responsibilities." *Reasonable Efforts*, at 20[7] (remarking that "[f]ederal audits and judicial oversight through the 'contrary to the welfare of the child' and 'reasonable efforts' findings remain the exclusive means for ensuring that the agency fulfills its legal responsibilities.").

Under this framework, the judiciary's role requires active scrutiny of the DHS's performance, not deference; clear, evidence-based findings supporting reasonable efforts determinations; and a willingness to question or reject boilerplate or conclusory reports that lack factual support.[8] In short, circuit courts must exercise independent judgment. To be effective, "reasonable efforts" findings must be specific to the facts and circumstances of the case, depending on the resources available in each community. This

---

[7] *See* fn. 1, *supra*.

[8] For this system of checks and balances to work effectively, counsel representing the DHS, adult respondents, and children in abuse and neglect proceedings must be cognizant of the DHS's responsibility for making "reasonable efforts," must address the reasonableness of the DHS's ongoing efforts at multi-disciplinary treatment team meetings, and must provide the circuit court with evidence throughout the case from which the court can make an independent evaluation of the DHS's efforts as required by law. Judge Edwards has observed "that neither the child nor the parents are well served when they wait until the termination hearing for the court to focus on reasonable efforts." Edwards, *supra* note 3, at 9.

requires that judges understand the services available in the communities they serve. *See Reasonable Efforts*, at 112 (discussing that a reasonableness "finding depends on the resources available in each particular community and in the agency, meaning that in order to make the reasonableness finding, the judge just have an understanding of service availability"). When determining if reasonable efforts have been made, courts must evaluate, among other things, the timeliness and adequacy of services offered; whether services were tailored to the specific family's needs; whether barriers to participation (i.e., transportation, disability, substance use treatment access, housing instability) were addressed; and whether the DHS actively facilitated, rather than passively suggested, reunification efforts.[9] This judicial oversight—the most powerful tool—preserves the

---

[9] The *Child Welfare Policy Manual* proposes the following additional guidelines:

> courts may entertain actions such as the following in determining whether reasonable efforts were made:
>
> (1) Would the child's health or safety have been compromised had the agency attempted to maintain him or her at home?
>
> (2) Was the service plan customized to the individual needs of the family or was it a standard package of services?
>
> (3) Did the agency provide services to ameliorate factors present in the child or parent, i.e., physical, emotional, or psychological, that would inhibit a parent's ability to maintain the child safely at home?
>
> (4) Do limitations exist with respect to service availability, including transportation issues? If so, what efforts did the agency undertake to overcome these obstacles?

integrity of the abuse and neglect system by ensuring that removal, dispositional, and permanent placement decisions are grounded in actual compliance with statutory and rule obligations.[10]

Turning now to the present case, both the DHS and the circuit court failed to satisfy their respective, statutory obligations related to "reasonable efforts." The majority opinion thoroughly details the DHS's "glaring failure to make reasonable efforts to preserve the family" and correctly addresses the DHS's various attempts to explain the failure. I concur with the majority's conclusion that, because of such failure, the abuse and

_____

> (5) Are the State agency's activities associated with making and finalizing an alternate permanent placement consistent with the permanency goal? For example, if the permanency goal is adoption, has the agency filed for termination of parental rights, listed the child on State and national adoption exchanges, or implemented child specific recruitment activities?

*Child Welfare Policy Manual, supra* note 3, § 8.3C.4.

[10] In several recent opinions, this Court has addressed the "intersecting obligations of the executive and the judiciary branches[]" in abuse and neglect proceedings, *In re D.H.*, 252 W. Va. 290, 922 S.E.2d 290, 298 (2024), recognizing that "[t]he authority and discretion afforded to courts in abuse and neglect cases is limited by constitutional and statutory bounds." *In re A.E.*, 927 S.E.2d 447, 454 (W. Va. 2026)*; see also State ex rel. W. Va. Dep't of Hum. Servs. v. Redding*, Nos. 24-658, 24-659, 2026 WL 1162606 (W. Va. April 29, 2026). While some courts are reluctant to engage in oversight of the DHS's efforts, other courts, such as those in *In re A.E.* and *Redding*, are passionate about ensuring that the DHS is fulfilling its duties to children and families. The discretion courts have in making "reasonable efforts" findings is the primary way that courts can exercise oversight of the DHS's efforts, within statutory bounds and within an actual case or controversy pending before the court. *See Redding*, 2026 WL 1162606 at *5-8; Edwards, *supra* note 3, at 10 (observing that "judges retain a great deal of discretion in their reasonable efforts decisions" due to the subjective nature of the "reasonable efforts" standard).

neglect process was frustrated, warranting remand. Unfortunately, here, the circuit court only referenced "reasonable efforts" to achieve permanency and neglected to hold the DHS accountable for its failure to make any effort to facilitate reunification in this case.

In both the August 2024 order following the dispositional hearing and in the October 2024 status order terminating parental rights, the circuit court made perfunctory findings that the DHS had made "reasonable efforts to achieve *permanency*," and that the case had been "properly managed." Neither order, however, included the language required by West Virginia Code § 49-4-604(c)(6)(C) regarding the "reasonable efforts" made by the DHS to preserve and reunify the family.[11] These findings are prerequisites to

---

[11] The relevant portion of West Virginia Code § 49-4-604(c)(6)(C) provides:

In determining whether or not parental rights should be terminated, the court shall consider the efforts made by the department to provide remedial and reunification services to the parent. *The court order shall state:*

(i) That continuation in the home is not in the best interest of the child and why;

(ii) Why reunification is not in the best interests of the child;

(iii) Whether or not the department made reasonable efforts, with the child's health and safety being the paramount concern, to preserve the family, or some portion thereof, and to prevent the placement or to eliminate the need for removing the child from the child's home and to make it possible for the child to safely return home, or that the emergency situation made those efforts unreasonable or impossible; and

(iv) Whether or not the department made reasonable efforts to preserve and reunify the family, or some portion thereof, including a description of what efforts were made or that those

13

disposition and termination decisions, not mere formalities. *See In re Edward B.*, 210 W.

Va. 621, 632, 558 S.E.2d 620, 631 (2001) (stating that requirements of abuse and neglect

statutes "are not mere general guidance; rather, they are stated in mandatory terms and vest

carefully described and circumscribed discretion in our courts, intended to protect the due

process rights of the parents as well as the rights of the innocent children."). Accordingly,

the circuit court erred in terminating the petitioner's parental rights without making the

required determination of whether the DHS's efforts to facilitate reunification of the

petitioner with his child were "reasonable." *See id.,* 210 W. Va. at 631, 558 S.E.2d at 630

(finding that basis for termination of parental rights was insufficient where dispositional

order failed to state whether the DHS had made reasonable efforts, as required by statute).

Based upon the foregoing, I concur with the majority opinion vacating the termination of

the petitioner's parental rights and remanding for further proceedings.

In conclusion, the DHS's "reasonable efforts" are the bridge between

removal, remediation of the abuse and/or neglect conditions, and the mandated goal of

reunification of the family, except in rare cases.[12] Therefore, a court's decisions related to

---

efforts were unreasonable due to specific circumstances.

W. Va. Code § 49-4-604(c)(6)(C), in part (emphasis added).

[12] According to 2022 fiscal year data compiled by the Adoption and Foster Care Analysis and Reporting System ("AFCARS"), the most frequent circumstances associated with a child's removal from the home in West Virginia were neglect related, such as parental drug abuse (45%), general neglect (32%), child behavior (15%), and housing issues (14%) while more serious circumstances such as physical abuse (9%), abandonment (6%), and sexual abuse (6%) were less frequently involved. *See* U.S. Dep't of Health & Hum. Servs., Admin. For Children & Families, *The AFCARS Report: West*

"reasonable efforts" "are not merely litigation management decisions, but decisions governing the lives and futures of the parties." *Enhanced Guidelines,* at 27.  In other words, because

> [a]ll decisions in a child welfare case are interrelated[,]. . . . interlocking[,] and sequential, the court performs a more material and directive function than in other types of cases.  Court decisions shape agency actions by identifying dangers and defining the agency's approach to each case and related delivery of services to the child and the family.  Regular court review of each case refines and redefines agency involvement.  Because of the nature of this decision-making in child welfare cases, the judge has a distinct impact on the course of agency work with each family.  More frequent and timely court oversight can effectively move children to safe permanency sooner.

*Id.*

---

*Virginia* (2023), https://www.wvlegislature.gov/legisdocs/2025/committee/public _comments/Hcrt/HB2369_03-04-2025-PC.PDF.PDF (last visited May 8, 2026). Therefore, cases involving aggravated circumstances, which are an exception to the requirement for the DHS to make reasonable efforts to reunify the family, are the exception to the norm.